**NEW YORK ISLANDERS HOCKEY CLUB, LLP, Plaintiff,**

v.

**COMERICA BANK—TEXAS and Joseph D. Lynch, Defendants.**

No. 98–CV–5790 (ADS).

United States District Court, E.D. New York.

Oct. 9, 1999.

Richards and O'Neil, LLP, New York City, for plaintiff New York Islanders Hockey Club, LLP; by Ted Poretz, Shari C. Reig, Jonathan Zavin.

Mayer, Brown & Platt, New York City (Steven Wolowitz, of counsel), for defendant Comerica Bank—Texas.

Brill & Meisel, New York City, for defendant Joseph D. Lynch: by Mark N. Axinn, Alan Brill.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This diversity matter concerns allegations by Plaintiff New York Islanders Hockey Club, LLP ("Islanders") of fraud, negligent misrepresentation, and negligent supervision against Defendant Comerica Bank—Texas ("Comerica") and its Senior Vice President, Joseph D. Lynch ("Lynch"), both residents of Texas. Presently before the Court are Defendants' motions to dismiss pursuant to Fed. R.Civ.P. 12(b)(2) and (6), to strike allegations pursuant to Fed.R.Civ.P. 12(f), and the Defendants' objections to the report and recommendation of the Magistrate Judge refusing to stay discovery.

### BACKGROUND

In approximately July of 1996, an individual named John A. Spano, a Texas resident, began negotiations with the owners of the Islanders, a National Hockey League franchise, to acquire the team. In November 1996, the Islanders' controlling owner, John O. Pickett, Jr. requested proof from the heretofore unknown Spano that he had sufficient assets to acquire the team. Spano apparently contacted Comerica through Lynch, and by letter dated November 14, 1996, Lynch sent this message to John Pickett at his address in Palm Beach, Florida:

> This letter is to inform you of John A. Spano's relationship with Comerica Bank—Texas.
>
> Mr. Spano maintains a net worth in excess of more than $100,000,000.00. We consider Mr. Spano to be a valued customer of our Bank, and he conducts his business in a satisfactory manner.

In actuality, Spano had no significant assets, and had fraudulently misrepresented his net worth to Comerica.

Based on the representations in the November 14 letter, John Pickett continued negotiations with Spano and ceded operational control of the team to Spano in early April 1997. On April 7, 1997, the Islanders, Spano, and a consortium of banks, including Comerica, held a closing on the transaction, although the amended complaint does not indicate where such closing took place. Plaintiff's brief—but not affidavits—in opposition to the motion states that the closing took place in New York, but seems to suggest that Comerica was not present there and was represented by another bank. The banks, several of which were acting through their offices in New York State, delivered a financing package of $80 million, and Spano was to have contributed $16.8 million of his own personal funds. Not surprisingly, Spano's contribution did not materialize.

Nevertheless, the Islanders proceeded to consummate the sale, allowing Spano additional time to make his payment. On April 9, 1997, Lynch and his deputy William Rolley were guests of Spano at an Islanders game in the Nassau Coliseum, at

which time Lynch explained to John Pickett's son, Barrett Pickett, that Comerica's participation in the financing of the deal was a courtesy to a valued customer like Spano.

On April 22, 1997, Spano flew to New York to deliver a personal check for $16.8 million, drawn on his Comerica account, to Barrett Pickett. On April 24, 1997, Barrett Pickett deposited the check, and Rolley repeatedly assured him that the check would clear as soon as it was presented to Comerica. However, Spano had stopped payment on the check on April 23, 1997. The Islanders allege that Spano's cancellation of the check was known to or should have been known to Rolley at the time he was making the assurances. Spano then explained to the Islanders that he would prefer to finance his portion of the payment by means of a personal loan he had applied for from Comerica. Expecting that the loan would clear faster than Spano's personal check, the Islanders' agreed. On April 25, 1997, Rolley assured Barrett Pickett that Spano's loan was nearly complete, and that all that was needed was Spano's signature. On April 28, 1997, Rolley telephoned Barrett Pickett and told him that the loan had been completed, and that the money would be wired into the Islanders' account in New York the next day. On April 29, Rolley again phoned Barrett Pickett, telling him that Comerica had "everything we need" and that the wire transfer would be completed later that day.

The wire transfer never took place. Instead, Spano explained that the assets necessary to make the payment were shielded from taxes in the Cayman Islands, and his tax attorney had advised him that it would take 30 days to resolve the tax issues before the money could be released to the Islanders. The Islanders agreed to wait and allow the payment to be made to an escrow account in the Caymans, from which the funds would eventually be released to the Islanders. On June 5, 1997, Spano deposited a $17 million check, drawn on a Comerica account in the name of Agusta Leasing, Inc., a corporation owned by Spano, in an account in the Cayman Islands. Although the Islanders allege that the Agusta Leasing account at Comerica did not contain any significant funds, Lynch phoned Barrett Pickett on July 9, 1997, explaining that there was no reason why the Augusta Leasing check would not clear when expected.

Approximately a week later, a Comerica employee apparently contacted the Islanders, asking to hold the Augusta Leasing check an extra day, purportedly to allow a check deposited in the Augusta Leasing account to clear. However, by this time, the Augusta Leasing check had already been dishonored for lack of funds, and there were no checks awaiting clearing for deposit in Augusta Leasing's account. Alas, the scheme at an end, Spano returned operational control of the team to John Pickett on July 11, 1997. The Islanders allege that, under Spano's control, they suffered damages in excess of $10 million.

The Islanders filed a complaint in the Eastern District of New York on September 15, 1998, and an amended complaint on January 19, 1999, alleging jurisdiction based on diversity under 28 U.S.C. § 1332 and venue on the basis that a substantial part of the events giving rise to the claim occurred in the district. The amended complaint contained four causes of action: fraud against both Defendants, negligent misrepresentation against both Defendants; a cause of action in *respondeat superior* against Defendant Comerica, and negligent supervision against Defendant Comerica.

The Defendants now move to dismiss the complaint, pursuant to Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction over them, or in the alternative, to transfer the case to the Northern District of Texas. Comerica contends that, as a Texas bank, it does not "do business" in New York State, and that the few phone calls made by Rolley to Barrett Pickett did not constitute "transacting business" under

N.Y.CPLR § 302(a)(1). It further contends that, even if it is "transacting business" in New York by virtue of its participation in the $80 million package financing Spano's purchase, the transactions in New York are unrelated to the Islanders' claims, since the Islanders do not allege any wrongdoing related to the issuance of the loan itself.

In the alternative, the Defendants move to dismiss each of the four causes of action under Fed.R.Civ.P. 12(b)(6) for failure to state a claim. The Defendants contend that the fraud cause of action, which encompasses the November 14, 1996 letter and the various post-closing representations made by Lynch and Rolley to the Islanders, fails to plead scienter and causation, and that some of the representations are non-fraudulent expressions of opinion or predictions of future events. The Defendants move to dismiss the negligent misrepresentation claim on the grounds that Comerica owed no special duty of care to the Islanders, given their arm's-length relationship, and that the negligent misrepresentation claim suffers from the same pleading defects as the fraud claim. Comerica also argues that the negligent hiring claim should be dismissed since the amended complaint fails to allege Comerica's knowledge of prior misrepresentations by its employees, and seeks dismissal of the *respondeat superior* cause of action on the grounds that no actionable fraud by any employee can be shown and that the Islanders do not allege that Comerica knew of the fraudulent acts so as to ratify them. In addition, Comerica moves to strike the claim for punitive damages, and to strike from the complaint allegations of previous fraudulent schemes by Spano that Comerica and Lynch allegedly participated in.

On the other hand, the Islanders contend that there is long-arm jurisdiction over Comerica based on its transaction of business within New York State, specifically a loan of $3 million to the Islanders, and a loan of $ 5 million to Spano, which was wired into the Islander's bank account as part of the financing of the sale. The Islanders further contend that, due to his role as a primary actor in Comerica's transactions, Lynch is also subject to personal jurisdiction in New York. The Islanders contend that the loans are sufficiently connected to the allegations of wrongdoing in the complaint to justify the exercise of personal jurisdiction. Moreover, the Islanders claim that jurisdiction is available under CPLR § 302(a)(3) on the ground that Lynch committed a tortious act in Texas that he should have expected to cause injury in New York. In addition, the Plaintiff defends the various causes of action as properly pleaded. Also, the Islanders oppose a transfer of the case to the Northern District of Texas.

### DISCUSSION

In ruling on a motion under Fed. R.Civ.P. 12(b), the court is to look only to the allegations of the complaint and any documents attached to or incorporated by reference in the complaint, *Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660, 662 (2d Cir.1996); to assume all well-pleaded factual allegations to be true; and to view all reasonable inferences that can be drawn from such allegations and documents in the light most favorable to the plaintiff. *Dangler v. New York City Off Track Betting Corp.,* 193 F.3d 130 (2d Cir.1999).

### A. As to personal jurisdiction over Comerica

If the Court relies on the pleadings and affidavits alone, the plaintiff need only make a prima facie showing of jurisdiction in order to defeat the motion to dismiss. *PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir.1997); *Welinsky v. Resort of World D.N.V.,* 839 F.2d 928, 930 (2d Cir.1988). Moreover, the pleadings and affidavits should be construed in the light most favorable to the plaintiff, and all doubts resolved in its favor. The Court should also keep in mind that "personal

jurisdiction inquiries are 'necessarily fact sensitive because each case is dependant upon its own particular circumstances.'" *PDK Labs. Inc., supra,* 103 F.3d at 1108 (quoting *Landoil Resources Corp. v. Alexander & Alexander Services, Inc.,* 918 F.2d 1039, 1043 [2d Cir.1991] ).

■ Personal jurisdiction over a defendant in a diversity action is determined by the law of the forum state. *CutCo Industries, Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986); *Arrowsmith v. United Press International,* 320 F.2d 219, 223 (2d Cir. 1963) (*en banc*). Consequently, the Court looks to New York's personal jurisdiction statutes, CPLR §§ 301 and 302, to determine whether the plaintiff has set forth a prima facie showing of in personam jurisdiction over the defendant. *See Slapshot Beverage Company, Inc. v. Southern Packaging Machinery, Inc.,* 980 F.Supp. 684, 686 (E.D.N.Y.1997).

■ CPLR § 302(a)(1) authorizes the exercise of personal jurisdiction over a nondomiciliary "who in person or through an agent ... transacts any business within the state or contracts anywhere to supply goods or services in the state." "A nondomiciliary 'transacts business' under CPLR 302(a)(1) when he 'purposefully avails [himself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws.'" *CutCo Industries, Inc. v. Naughton,* supra, 806 F.2d at 365 (internal citations and quotations omitted). In addition, a plaintiff establishing jurisdiction under a "transacting business" theory must also show that the causes of action "arise out of" defendant's transactions within the state. *Kronisch v. U.S.,* 150 F.3d 112, 130 (2d Cir.1998). "No single event or contact connecting the defendant to the forum state need be demonstrated; rather, the totality of all defendant's contacts with the forum state must indicate that the exercise of jurisdiction would be proper." *Id.; see also Bank Brussels Lambert v. Fiddler, Gonzalez & Rodriguez,* 171 F.3d 779, 787 (2d Cir.1999).

As the amended complaint does not allege that Comerica was ever physically present in New York State, and Lynch's only appearance there was as a social guest of Spano at a hockey game, the cornerstone of the Islanders' personal jurisdiction claim against Comerica must be its participation in the consortium of banks financing the sale. Comerica admits that it extended $ 5 million in credit to the Islanders, a New York limited partnership, in April of 1997, as part of the Spano purchase. The Credit Agreement between the consortium banks and the Islanders states that it is to be governed by New York State law, and obligates Comerica to provide documents and notices to its co-lenders, including other New York banks. There is no question that Comerica purposefully entered into the loan agreement in New York, and that it has purposefully availed itself of the benefits and protections of conducting business in New York, at least as to this particular loan. *CutCo Industries,* 806 F.2d at 365. This single act of lending, coupled with several telephone calls into New York by Comerica concerning the funding of the purchase, is sufficient under New York law to constitute "transacting business" by Comerica in New York State. *Bank Brussels Lambert,* 171 F.3d at 787; *Bluestone Capital Partners v. MGR Funds Ltd.,* 1999 WL 322658 at * 4 (S.D.N.Y.1999) ("proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York"). Even assuming that Comerica never physically entered New York State to consummate the transaction, the Second Circuit has queried "whether, in this age of e-mail and teleconferencing, the absence of actual personal visits to the forum is any longer of critical consequence." *Agency Rent A Car System, Inc. v. Grand Rent A Car Corp.,* 98 F.3d 25, 30 (2d Cir.1996).

■ However, finding that Comerica transacts business in New York does not end the inquiry. Under CPLR

§ 302(a)(1), personal jurisdiction based on a "transacting business" theory also requires that the plaintiff's claims "arise out of" the defendant's transactions in the state. *Kronisch v. United States*, 150 F.3d 112, 130 (2d Cir.1998); *Agency Rent A Car System*, 98 F.3d at 29. A claim "arises out of" a transaction if it is "sufficiently related to the business transacted that it would not be unfair to deem it to arise out of the transacted business." *PDK Labs, Inc.*, 103 F.3d at 1109, *citing Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 59 (2d Cir.1985). Put another way, there must be a "substantial nexus" between the business transacted and the cause of action sued upon. *Agency Rent A Car System*, 98 F.3d at 31.

■ The Islanders' complaint alleges that Comerica committed fraud and negligently misrepresented Spano's wealth in order to assist him in arranging a purchase of the team. Taking the Islanders' allegations in the light most favorable to them, as the Court must at this stage of the proceedings, *Dangler, supra*, 193 F.3d 130, the Court finds that both the alleged fraudulent statements and the loan issued by Comerica in New York were important elements of Comerica's overall plan to assist Spano to acquire the Islanders. The loan to the Islanders was issued as part of Spano's agreement to buy the team, and the alleged misrepresentations by Comerica were necessary to keep the loan deal viable. Viewing the complaint in the light most favorable to the Islanders, the misrepresentations arose out of Comerica's desire to create and preserve Comerica's role in a potentially lucrative and prestigious business deal that Comerica had struck in New York. Therefore, I find that the Islanders have made a sufficient *prima facie* showing that this Court has personal jurisdiction over Comerica.

■ Lynch has also moved to dismiss the complaint against him for lack of personal jurisdiction. The amended complaint is directed at Lynch "in his capacity as a senior officer of Comerica." Lynch's signature on the March 31, 1997 credit agreement with the Islanders indicates that it was signed in his role as Senior Vice President of Comerica. Thus, the precise transaction of business that subjects Comerica to personal jurisdiction in New York was conducted by Lynch himself. Also, as the causes of action "arise out of" Comerica's transaction of business in New York, Lynch's participation in that transaction of business mean that the causes of action alleged against him in his official capacity arise from his transaction of business as well. In sum, the Court has personal jurisdiction against Comerica, and it has personal jurisdiction against Lynch in his official capacity.

Accordingly, because this Court has personal jurisdiction over both Defendants, their motions to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(2) is denied.

**B. The Defendants' motion to transfer**

The Defendants move, in the alternative to dismissal, to transfer the case to the Northern District of Texas. Such a transfer is justified, claim the Defendants, by the fact that both Comerica and Lynch are Texas residents, and that some of the alleged acts were done in Texas.

A motion to transfer venue from one federal district court to another, when venue initially is proper, is governed by 28 U.S.C. § 1404(a), which provides in relevant part: "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil case to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). *See generally Filmline (Cross-Country) Prods., Inc. v. United Artists*, 865 F.2d 513, 520 (2d Cir.1989).

■ The moving party has the "burden to clearly establish that a transfer is appropriate and that the motion should be granted." *Laumann Mfg. Corp. v. Castings USA Inc.*, 913 F.Supp. 712, 720 (E.D.N.Y.1996) See also *Factors Etc. Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218–19 (2d

Cir.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979). The movant must support the motion with an affidavit containing "detailed factual statements" explaining why the transferee forum is more convenient, including "the potential principal witnesses expected to be called and a general statement of the substance of their testimony." *Laumann Mfg. Corp.,* 913 F.Supp. at 720; *see also Factors,* 579 F.2d at 218; *Schieffelin & Co. v. Jack Co. of Boca, Inc.,* 725 F.Supp. 1314, 1321 (S.D.N.Y.1989).

The Defendants' motions do not include such detailed factual statements. Without such statements, it is difficult for the Court to weigh the numerous factors that go into a determination of whether the interests of justice are served by a transfer. *Wine Markets Intl. v. Bass,* 939 F.Supp. 178 (E.D.N.Y.1996). Failure to make a specific showing of the facts justifying transfer may be excused under some circumstances, for example, where logic suggest that the witnesses and documents would be in the proposed transferee court. *See Tomchuck v. Union Trust Co.,* 875 F.Supp. 242, 244–45 (S.D.N.Y.1995). However, where the Plaintiff has chosen this forum, and at least some of the major witnesses, such as Barrett Pickett, are located in New York, it cannot be said that it would be illogical or unfair to try the case in New York. *Wine Markets Intl.,* 939 F.Supp. at 183 (plaintiff's initial choice of forum is entitled to "great weight.")

Therefore, the Defendants' motions to transfer this case to the Northern District of Texas are denied.

### C. The motions to dismiss the fraud causes of action

Both Defendants move to dismiss the fraud causes of action alleged against them under Fed.R.Civ.P. 12(b)(6) for failure to properly plead the elements of fraud. The elements of a cause of action for fraudulent misrepresentation in New York are that (1) the defendant made a false representation of a material fact; (2) with knowledge of its falsity; (3) with scienter, namely an intent to defraud the plaintiff; (4) and upon which plaintiff justifiably relied; and (5) thereby causing damage to the plaintiff. *Cofacredit v. Windsor Plumbing Supply,* 187 F.3d 229, 238 (2d Cir.1999); *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994). Specifically, the Defendants contend that the allegations of fraud fail to plead the essential elements of scienter and proximate causation.

#### (i) Scienter

The Second Circuit has recognized that "great specificity [is] not required with respect to ... allegations of ... scienter." *Connecticut National Bank v. Fluor Corp.,* 808 F.2d 957 (2d Cir.1987) *citing Goldman v. Belden,* 754 F.2d 1059, 1070–71 (2d Cir.1985). The absence of a requirement that scienter be alleged with "great specificity" is based on the premise that a plaintiff realistically cannot be expected to plead a defendant's actual state of mind. *Id., citing Ross v. A.H. Robins Co.,* 607 F.2d 545, 555–58 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). Moreover, scienter can be inferred circumstantially from other allegations in the complaint. *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 86 (2d Cir.1999), *citing Griffin v. McNiff,* 744 F.Supp. 1237, 1246 (S.D.N.Y.1990), *aff'd,* 996 F.2d 303 (2d Cir.1993).

The Islanders' amended complaint alleges that financing the purchase of a professional sports team is a prestigious and high-profile business activity for Comerica. Moreover, the amended complaint alleges that Lynch and other Comerica officials received lavish gifts from Spano in return for their continued cooperation with him. This economic benefit to the Defendants from their continuing, supportive relationship with Spano, coupled with the Islanders' allegations, which we accept as true for purposes of the Defendants' motions, *Dangler, supra,* 193 F.3d 130, that Lynch and Comerica knew that Spano lacked any significant resources, provides

a sufficient factual basis to infer that Lynch and Comerica acted with an intent to defraud the Islanders.

### (ii) Causation

■ As to the Defendants' claim that the Islanders failed to adequately plead causation, under New York law, an "injury is proximately caused if it is the natural and probable consequence of the defrauder's misrepresentation or if the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud." *Citibank N.A. v. K–H Corporation,* 968 F.2d 1489 (2d Cir.1992), *citing Cumberland Oil Corp. v. Thropp,* 791 F.2d 1037, 1044 (2d Cir.), *cert. denied,* 479 U.S. 950, 107 S.Ct. 436, 93 L.Ed.2d 385 (1986).

■ Here, the Islanders allege that, were it not for Comerica and Lynch's initial misrepresentations, it would not have entered into the agreement with Spano, and that, were it not for the continuing misrepresentations by the Defendants, it would have terminated the deal and recovered control of the team before Spano could cause any more harm to it. These contentions sufficiently allege that the Islanders' loss was a direct and foreseeable result of the Defendants' acts. *See e.g. Ross v. Patrusky, Mintz & Semel,* 1997 WL 214957 (S.D.N.Y.1997) (the court refused to dismiss a fraud claim in shareholder suit where the complaint sufficiently alleged that accountants' fraudulent certification of books of company being looted by its owners was a proximate cause of the shareholders' losses).

While the Defendants argue that Spano's criminal fraud broke any chain of causation between the November 14, 1996 letter from Lynch and Spano's eventual looting of the team's assets, the Second Circuit held in *Cullen v. BMW of North America, Inc.,* 691 F.2d 1097 (2d Cir.1982), *cert. denied,* 460 U.S. 1070, 103 S.Ct. 1525, 75 L.Ed.2d 948 (1983), that "an intervening act, tortious or criminal, will ordinarily insulate a negligent defendant from liability *when the subsequent act could not have been reasonably anticipated by the defendant.*" 691 F.2d at 1101 (emphasis added, citations omitted). Here, the Islanders allege that Comerica and Lynch *could* have anticipated Spano's criminal conduct. Specifically, the Islanders allege that Comerica had helped to finance previous fraudulent schemes by Spano. Taking this allegation as true for purposes of this motion, Comerica cannot be heard to claim that it could not have anticipated Spano's subsequent fraudulent activities.

The cases of *Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489 (2d Cir.1992) and *Bennett v. U.S. Trust Co. of New York,* 770 F.2d 308 (2d Cir.1985), cited by the Defendants at oral argument, do not alter this conclusion. In both cases, the court held that the plaintiffs had failed to adequately allege that the defendants' acts were the direct cause of their injuries. However, both cases are factually distinguishable from this case. In *Citibank,* the plaintiff bank agreed to finance the defendant's purchase of a company, in exchange for a pledge of the defendant's own stock as security. When the deal collapsed and the pledged stock turned out to be worth less than expected, Citibank filed a claim of fraud. The Second Circuit upheld the dismissal of the fraud claim, however, because although Citibank adequately pleaded that the pledge of the stock caused it to enter into the transaction, it failed to allege how the defendants' fraudulent incurring of a private loan caused the bank's damages—that is, how the defendant's fraud caused the value of the pledged stock to drop. Similarly, in *Bennett,* the plaintiffs deposited stock with the defendant bank based on a false statement of the law by the bank. When the stock price later dropped, the defendants sued the bank, and the Second Circuit affirmed dismissal of the plaintiffs' fraud claim since the plaintiffs failed to allege how the bank's misstatement caused their loss—the decline in value of the stock.

■ Unlike these cases, where there is a questionable linkage between the defendants' false statements and the plaintiffs' damages due to external events like falling stock prices, there is a clear and direct connection between Comerica's fraudulent statements and the Islanders' damages. While Comerica argues that the direct cause of the damages to the Islanders was Spano's mismanagement, the acts of a third person intervene between the defendant's conduct and the plaintiff's injury, the causal connection is not automatically severed; in such a case, liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's acts. *Derdiarian v. Felix Contr. Corp.*, 51 N.Y.2d 308, 315, 434 N.Y.S.2d 166, 414 N.E.2d 666 (1980). Because questions concerning what is foreseeable and what is normal may be the subject of varying inferences, these issues generally are for the fact finder to resolve. *Id.* While the Court agrees that, in cases like *Citibank* and *Bennett,* a decline in stock prices was not a foreseeable consequence of a person making false statements about matters unrelated to the stock itself, the Court is not willing to decide that a jury could not find that the looting of a professional hockey team by an established con artist could not be foreseen by a bank that, knowing the propensities of the con artist, purposefully assisted him in obtaining and preserving his ownership of the team. On the face of the amended complaint, drawing inferences in favor of the Islanders, the Court finds that the Islanders have adequately pled that Defendants' acts were the proximate cause of its damages.

### (iii) False representations

■ Finally, the Defendants allege that the numerous post-closing statements allegedly made by them are non-actionable statements of opinion or predictions of future events. The Defendants are correct that statements which are mere "puffery" or opinions as to future events are not sufficient to state a fraud claim. *Cohen v.* *Koenig,* 25 F.3d 1168 (2d Cir.1994), *citing Quasha v. American Natural Beverage Corp.,* 171 A.D.2d 537, 537, 567 N.Y.S.2d 257, 257 (1st Dep't 1991). However, a relatively concrete representation as to a defendant's future performance, if made at a time when the speaker knows that the represented performance cannot be achieved, may ground a claim of fraud. *Id., citing Goldman v. Belden,* 754 F.2d 1059, 1068–69 (2d Cir.1985).

■ Here, the Islanders have alleged that Rolley's phone calls to Barrett Pickett, assuring him that Spano's $ 16.8 million loan was completed and that the proceeds would be wired to the Islanders later in the day, were made with knowledge that those representations were false. These are clearly statements of fact, not opinions or predictions. Likewise, the amended complaint asserts that, when Lynch told Barrett Pickett that there was no reason why Spano's $17 million check on the Augusta Leasing account would not clear, Lynch knew that the Augusta Leasing account did not contain sufficient funds to honor the check and that Spano did not have sufficient personal resources to make good on the check. Reading the complaint in the light most favorable to the Islanders, it is fair to say that these representations predicted future business transactions that Comerica knew could not be performed. As such, these statements may be actionable fraudulent misrepresentations.

Therefore, the Defendants' motions to dismiss the fraud causes of action for failure to state a claim are denied.

### D. The motion to dismiss the negligent misrepresentation causes of action

Next, the Defendants move to dismiss the negligent misrepresentation claim under Rule 12(b)(6) on the grounds that no "special relationship" existed between the Islanders and Comerica.

 Under New York law, a cause of action for negligent misrepresentation exists

> where there is carelessness in imparting words upon which others were expected to rely and upon which they did act or failed to act to their damage ..., but such information is not actionable unless expressed directly, with knowledge or notice that it will be acted upon, to one whom the author is bound by some relation of duty, arising out of contract or otherwise, to act with care if he acts at all....

*Mallis v. Bankers Trust Co.*, 615 F.2d 68, 81 (2d Cir.1980). The "special relationship" or "duty" element of the cause of action is satisfied by showing: (1) an awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance. *Doehla v. Wathne Limited, Inc.*, 1999 WL 566311 at * 20 (S.D.N.Y.1999), *citing Prudential Ins. Co. of America v. Dewey, Ballantine*, 80 N.Y.2d 377, 382, 590 N.Y.S.2d 831, 605 N.E.2d 318 (1992).

 Here, Lynch prepared the November 14, 1996 letter well aware that John Pickett would be relying upon it in deciding whether to continue negotiations with Spano; indeed, the letter is addressed directly to Pickett, indicating that Lynch was aware of both the intended recipient and the purpose for which the letter was sought. Lynch knew that the letter would be relied upon by Pickett, and in the Court's view, the necessary elements of a special relationship exist under New York law.

In this respect, the case is similar to *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985). There, the New York Court of Appeals reversed the dismissal of a complaint that alleged a negligent misrepresentation cause of action against an accounting firm that had provided audits of a client's books to the client's bank. The Court held that because the accounting firm knew of the bank's reliance on its auditing, and the accounting firm had numerous communications with the bank regarding the client's financing, the requisite special relationship existed between the bank and the accounting firm, so that there could be held liability under this theory. *Id.*, 65 N.Y.2d at 554, 493 N.Y.S.2d at 445, 483 N.E.2d 110. Almost the identical situation is presented here: Spano solicited the services of Comerica, just as the client in *Credit Alliance* solicited the accounting firm, to draft papers so that another party could accurately assess his financial status. Moreover, like the defendant in *Credit Alliance* who continued to meet with the bank to discuss the client's finances, after making the initial false representation here, Comerica continued to communicate with the Islanders concerning matters related to Spano's finances. Under these circumstances, where the New York Court of Appeals found a claim of negligent misrepresentation to lie, the Defendants' motions to dismiss the negligent misrepresentation causes of action for failure to state a claim must be denied.

### E. The motion to dismiss the *respondeat superior* claim

 Comerica moves to dismiss the *respondeat superior* cause of action under Rule 12(b)(6). Under the doctrine of respondeat superior, an employer is answerable for the torts of an employee who acts within the scope of his or her employment. *Rausman v. Baugh*, 248 A.D.2d 8, 682 N.Y.S.2d 42 (2d Dept.1998), *citing Riviello v. Waldron*, 47 N.Y.2d 297, 418 N.Y.S.2d 300, 391 N.E.2d 1278 (1979). The purpose of the rule is to render the employer responsible, in proper cases, for the employee's tortious acts, which although errant, were done in furtherance of the employer's business. *Id., citing Sauter v. New York Tribune*, 305 N.Y. 442, 113 N.E.2d 790 (1953).

Comerica first alleges that the Islanders have failed to allege a tort by any Comerica employee. As this Court finds that sufficient allegations of fraud and negligent misrepresentation have been pleaded against Lynch, this contention is rejected. Comerica also argues that the amended complaint does not allege that Comerica had knowledge of the alleged torts of Lynch, and thus could not have ratified the acts, thereby relieving it of *respondeat superior* liability. Such a proposition is absurd. There is no indication that Lynch, a Senior Vice President of Comerica, concealed his dealings with the Islanders from the company. Moreover, the Second Circuit has held that a firm is more appropriately liable for the tortious behavior of a vice president than for a routine employee. *First Interregional Equity Corp. v. Haughton*, 805 F.Supp. 196, 202 (S.D.N.Y.1992), *citing S.E.C. v. Management Dynamics Inc.*, 515 F.2d 801, 813 (2d Cir.1975) *and S.E.C. v. Geon Indus. Inc.*, 531 F.2d 39, 54–55 (2d Cir.1976). On this basis, the Islanders have adequately alleged a basis for holding Comerica liable for the torts of Lynch. The motion by Comerica to dismiss the *respondeat superior* claim is denied.

## F. The motion to dismiss the negligent supervision claim

Comerica moves to dismiss the Islanders' claim that it was negligent in failing to closely supervise Lynch's dealings involving Spano. Comerica alleges that it had no knowledge of any objectionable conduct by Lynch, and thus, no duty to require heightened scrutiny of his actions on Spano's behalf.

The amended complaint alleges that both Comerica and Lynch provided false representations of Spano's assets to others, including the Dallas Stars hockey team in 1995 and a South African cookware company in 1996. Taking these allegations as true for purposes of this motion, it is clear that not only was Comerica aware of Lynch's prior fraudulent acts on Spano's behalf, it actively participated in them.

Therefore, Comerica's motion to dismiss the negligent supervision claim is denied.

## G. The motion to strike the punitive damages claim and other allegations

Finally, Comerica moves under Fed. R.Civ.P. 12(f) to strike claims from the amended complaint, including the Islanders' request for punitive damages and the allegations of the prior frauds committed by Spano on the Dallas Stars hockey team and the South African cookware company.

A motion to strike allegations in the complaint under Fed.R.Civ.P. 12(f), on the ground that the matter is impertinent and immaterial, will be denied unless it can be shown that no evidence in support of the allegation would be admissible. *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir.1976), *citing Gleason v. Chain Service Restaurant*, 300 F.Supp. 1241 (S.D.N.Y.1969), *aff'd*, 422 F.2d 342 (2d Cir.1970); *Wine Markets Intl. v. Bass*, 177 F.R.D. 128 (E.D.N.Y.1998); *Moy v. Adelphi*, 866 F.Supp. 696, 709 (E.D.N.Y. 1994). Here, the previous Spano frauds that were allegedly aided by Lynch and Comerica are potentially admissible in evidence in support of several allegations. They are relevant to the negligent supervision claim, to show Comerica's knowledge of Lynch's prior fraudulent activity. They are also relevant to the fraud causes of action, to show that Lynch and Comerica were aware, from previous dealings with Spano, that he lacked significant assets to complete such large transactions. As these allegations may be admissible as evidence, the motion to strike them must be denied. *Wine Markets Intl.*, 177 F.R.D. at 135.

Finally, as to Comerica's motion to strike the claim for punitive damages, whether there is sufficiently egregious conduct to support an award of punitive damages is an evidentiary matter that cannot

be decided on a motion to dismiss. *Vento & Co. of New York v. Metromedia Fiber Network, Inc.,* 1999 WL 147732 at * 16 (S.D.N.Y.1999). Following discovery, if Comerica still believes that the evidence against it fails to rise, as a matter of law, to the requisite level for an award of punitive damages, it may seek summary judgment dismissing that request. Thus, Comerica's motion to strike the Islanders' claim for punitive damages is denied without prejudice.

### H. As to the objections to Magistrate Judge Lindsay's Order

In addition, Defendants have filed objections to the June 3, 1999 order of United States Magistrate Judge Arlene Lindsay, which denied the Defendants' requests for a stay of discovery pending decision on the motions to dismiss. Since those motions to dismiss are now decided, the issue is moot. Moreover, the standard of review in hearing objections to decisions of a magistrate judge under 28 U.S.C. § 636(b)(1)(a) is whether the Magistrate Judge's decision is "clearly erroneous or contrary to law." *See also* Fed.R.Civ.P. 72(a); *Bergstein v. Jordache Enterprises, Inc.,* 841 F.Supp. 546 (S.D.N.Y.1994). On the merits, giving deference to Judge Lindsay's decision, this Court cannot say that her decision not to stay discovery was either "clearly erroneous" or "contrary to law."

### *CONCLUSION*

For the foregoing reasons, it is hereby

**ORDERED** that the Defendants' motions to dismiss the case for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2), or, in the alternative, to transfer the case to the Northern District of Texas and to strike allegations of previous frauds by Spano pursuant to Fed.R.Civ.P. 12(f), are DENIED; and it is further

**ORDERED** that the Defendants' motions to dismiss the fraud and negligent misrepresentation claims for failure to state a claim under Fed.R.Civ.P. 12(b)(6) are DENIED; and it is further

**ORDERED** that the Defendant Comerica's motions to dismiss the *respondeat superior* and negligent supervision causes of action for failure to state a claim are DENIED; and it is further

**ORDERED** that the Defendant Comerica's motion to strike the claim for punitive damages is DENIED without prejudice; and it is further

**ORDERED** that the Defendants' objections to the June 3, 1999 decision and order of United States Magistrate Judge Arlene Lindsay is DENIED as moot.

**SO ORDERED**